Filed 9/3/21  In re S.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re S.R. et al., Persons Coming Under
the Juvenile Court Law.

| | |
|---|---|
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076576 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J276331 & J276332) |
| v. | OPINION |
| S.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel for Plaintiff and Respondent.

1

On January 25, 2021, the juvenile court terminated S.R.'s (father) parental rights to I.R. and S.R. (the children) under Welfare and Institutions Code[1] section 366.26 and selected adoption as the permanent plan. On appeal, father contends the parent-benefit exception to termination applies. (§ 366.26, subd. (c)(1)(B)(i).) Because the record fails to demonstrate the kind of deep bond required to come within that exception, we conclude the court properly found that it does not apply. We therefore affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A.     *Detention.*

On or around May 21, 2018, father's children I.R. (born 2016) and S.R. (born 2017) came to the attention of the San Bernardino County Children and Family Services (CFS) when a 10-day referral alleging general neglect and physical abuse was received regarding their half-sibling by their mother.[2] The half-sibling suffered visible injuries, including "several bruises on her back in different spots, in different stages of healing, and different colors," "on her side/back . . . by the bottom of her ribcage," "on the top of her left shoulder," "on the outside of her right lower leg," "on her ankle bone," and "on her left lower leg." There was also evidence suggesting strangulation. The injuries were suspicious for physical abuse. Mother and the half-sibling were living with the children's paternal grandfather, but the children and father were living elsewhere.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Neither the half-sibling nor mother are subjects of this appeal.

On May 29, 2018, CFS filed dependency petitions for the children under section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling). The petitions alleged father knew or reasonably should have known that the children were at risk of harm or neglect in the care of mother and the paternal grandparents, and the children were at risk of physical abuse or neglect based on mother's neglect and abuse of their half-sibling. The children were maintained with father.

B.     *Jurisdiction/Disposition Reports and Hearing.*

In the jurisdiction/disposition report filed June 15, 2018, CFS recommended the children be removed from mother and maintained with father. Father reported that he and mother never lived together, he had obtained full custody of the children on February 18, 2018, he resided with the children, and the paternal grandmother supervised them at the paternal grandfather's home while father was at work. Initially, CFS was "unsuccessful in contacting" mother. However, before the jurisdiction/disposition hearing, CFS filed amended dependency petitions, which alleged that father caused the half-sibling's injuries. The amended petitions alleged that the children were in danger of abuse because father had subjected their half-sibling to abuse, including "water curing," and while in mother's care, the half-sibling was subjected to "water curing, strangulation, and forced feeding" (§ 300, subd. (a)); father and mother engaged in domestic violence in the presence of the children (§ 300, subd. (b)); the injuries to the half-sibling, who was under five years old, were severe and cruel (§ 300, subds. (e), (i)); and, because the half-sibling was abused and neglected, there was substantial risk that the children would be abused or neglected (§ 300, subd. (j)). At her interview with CFS, mother disclosed that

father and the paternal grandmother had caused the half-sibling's injuries, and that the paternal grandmother "told her to report that [father] lived in another home with the children . . . and . . . [the paternal grandmother] . . . does not live in the home."

According to the jurisdiction/disposition addendum report filed August 8, 2018, CFS recommended the children be removed and placed in "out of home" care and that no reunification services be provided for father. CFS reported that father, mother, the paternal grandparents, and the children were all living in the same home. Mother stated that the paternal grandmother utilized various objects to hit the half-sibling (leaving marks or bruises); force-fed her (because she was a slow eater), causing her to vomit; forced her to clean up her vomit with her hands; forced her to drink "'a bunch of nasty things in a blender'" if she drank from I.R.'s sippy cup; used water to simulate drowning her; choked her by grabbing her around the neck so she could not breathe; and injured her arm while twisting it. Mother also stated that she witnessed father (1) beat the half-sibling with a back scratcher while she was laying on the ground, (2) hold her head under running water to the point she was unable to breathe, then throw her down on the floor, and (3) throw a frying pan at her head causing her to bleed. Mother acknowledged domestic violence between her and father, claiming he would punch her in the face and body. According to the social worker, the half-sibling also suffered healing fractures, and she said that father, whom she called, "uncle," was "'not taking care of [her] right,'" was "mean," and "'makes [her] bleed on [her] forehead.'" On August 8, 2018, the children were removed from father's custody, and the matter was continued for further hearing.

4

The contested jurisdiction/disposition hearing took place over several days. Father testified that he had full custody of the children, who had lived with him since their birth. He denied causing, or having any knowledge about, the half-sibling's injuries. He also denied any domestic violence involving mother. He testified that after learning about the half-sibling's injuries, he was concerned about the children being around his parents. Mother testified about father physically abusing her and about father and the paternal grandmother physically abused the half-sibling. However, mother opined that father did not pose a risk to his own children.

On November 27, 2018, the juvenile court sustained the allegations in the petitions, except for the dismissed allegations under section 300, subdivisions (e) and (i); denied reunification services for father under the section 361.5, subdivision (b)(6), bypass provision, based on his treatment of the half-sibling; and set a section 366.26 hearing.

C.     *Section 366.26 report.*

According to the section 366.26 report filed March 19, 2019, CFS recommended termination of father's parental rights and continuance of permanency planning services. The children were doing well in their placement, despite I.R.'s night terrors and initial behavior of chewing on doors, windowsills, and other objects. He was diagnosed with autism and epilepsy. After receiving the right services, he was "making great strides in his emotional and behavioral well-being." S.R. did not need any services, and both children appeared well cared for by their foster parents. CFS reported that father had visited the children every week, and they were visibly affectionate. According to the foster mother, the children "become very excited" when they are told they are going to

5

see father. There were some complaints that father ignored I.R.'s allergy to citric acid by bringing food and drinks containing such ingredient, but when the circumstances were explained to him, he cooperated.

On March 27, 2019, the juvenile court found that termination of parental rights would not be detrimental to the children, but no adoptive parent had been identified or available, and the children were difficult to place because they are a sibling group that includes a member with a medical disability.[3]

D.      *Section 388 petition and hearing.*

On September 20, 2019, father filed a section 388 petition requesting the juvenile court reinstate reunification services and increase visitation. Father had completed several programs, including classes in nurturing, food allergies, domestic violence, nutrition, anger management, and parenting education at his own expense, and he had participated in individual counseling. According to father, he had a strong bond with the children, and they would benefit from the knowledge and skills he acquired from the programs he had completed. The court ordered CFS to respond to father's petition.

The status review report filed September 24, 2019, reported that the children were doing well in their placement, and the foster parents were meeting their emotional needs. Father consistently visited the children; however, he preferred I.R. over S.R., who was "like her mom." Father redirected I.R. when he was playing with a toy "for girls," and

---

[3] While the court authorized CFS to place the children with maternal relatives in Texas, such placement was later denied by the Texas Department of Family and Protective Services.

made S.R. cry when he noticed that she was trying to go potty in her diaper by telling I.R., "Look, [I.R., S.R.] is going ca ca." After CFS informed father about acceptable behavior, the visits were better.

In response to the section 388 petition, CFS asserted father did not take parenting intervention "easily," and he could be "defiant." According to the foster parent, the children showed "signs of not wanting to" visit with father; I.R. "begins to vomit [and] becomes sad," and S.R. "begins to pinch her lips or pokes her nose to make them bleed." Both "children are unable to sleep or eat . . . before and after . . . visits. Unable to interview father, the social worker could not assess whether he had benefited from therapy or his completed programs, nor could she determine whether he would be appropriate with the children outside of supervised visitation. Also, the social worker expressed concern about father's claim that he has a strong support system with his family and friends because no one had come forward to support his efforts. CFS recommended the juvenile court deny the petition.

Hearing on the petition was continued to allow CFS to interview father. Based on the interview, CFS reported that father was unable to provide sufficient information as to how he would provide for I.R.'s special needs and obtain necessary treatment. The social worker opined that father did not have a clear understanding of the children's needs and would be unable to make the necessary changes in his lifestyle to support their welfare.

On November 4, 2019, the juvenile court denied father's section 388 petition and set a section 366.26 hearing.

*E. Section 366.26 report.*

According to the section 366.26 report filed February 25, 2020, the children had been living with Mr. and Mrs. R. since July 10, 2019, and the couple wanted to adopt them. Visitation with father continued, and the children were responding to him in a positive manner. However, CFS recommended termination of parental rights and adoption as the permanent plan; father requested a contested hearing.

On August 25, 2020, the contested hearing was continued because the children had been placed in a new adoptive home (Mr. & Mrs. E.) on July 9th. The children's counsel raised concerns regarding father's visitation based on the foster mother's report that the children were exhibiting "distressing behaviors" before and after visitation. At the juvenile court's request, CFS submitted a nonappearance review packet outlining concerns regarding visitation. CFS reported the children had been placed in three different foster homes. Each home claimed the children exhibited concerning behaviors before and after visitation. More recently, Mr. and Mrs. E. had kept "detailed records regarding the children's behavior and any issues that have come up." On the days surrounding their visits with father, the children experienced night terrors, sleepwalking, tantrums and "tummy troubles," including diarrhea. When the visits were canceled, there were no behavior issues, but once visitation was set to resume, the diarrhea and other issues resumed. On August 10, 2020, the children claimed that father "hit" them on their "hands."

On September 11, 2020, S.R. was taken to the pediatrician about her night terrors, diarrhea, and bald spots on her scalp. The pediatrician "associated all of these issues with

8

anxiety and referred [the child] to psychiatry." On September 21, 2020, another therapist diagnosed both children with posttraumatic stress disorder (PTSD), which suggests that they "have likely witnessed abuse or domestic violence by their father, or have possibly been the victims of abuse before they were removed from the father[, and t]he memories are now likely coming to the forefront of their consciousness." CFS requested that father's visitation be reduced to once monthly, and the juvenile court so ordered on October 8, 2020.

### F.    Second section 388 petition and hearing.

On October 20, 2020, father filed another section 388 petition requesting reinstatement of weekly visitation because the juvenile court failed to consider that his visits occurred immediately after mother's and, thus, the children's behavioral issues could be attributed to their visits with her. Father argued that his request would benefit the children because their "relationship is extremely strong," and they "have an unbreakable bond." In response, CFS and the children's counsel recommended the petition be denied. CFS noted that during October, when visitation was limited to mother only, the foster parents reported the children had no behavioral issues and were calm, and mother noticed that the children were "'a lot more calm'" during the visits. However, after the November 9, 2020 visit, which included father, the children's behavioral issues resumed. The social worker opined that the children were "triggered by the father," because they "either witnessed the father abusing their [half-sibling], engaging in domestic violence with the mother . . . , or were victims of abuse themselves by the father." While the social worker believed the children had "some bond" with father, she

9

was "unsure if this [was] enough to be of any benefit for [them] to be happy and healthy, based on their behaviors after each visit."

The juvenile court summarily denied father's petition.

G.      *Updated section 366.26 report and hearing.*

According to the updated section 366.26 report filed November 25, 2020, CFS continued to recommend termination of parental rights and adoption as the permanent plan. The social worker noted that during the past 10 months, father had appeared "rational, polite, and his demeanor [had] improved quite a bit. . . . He [was] kind and loving with the children. [He was] much better with [S.R.] and more affectionate with her. He [was] alert for safety issues and [was] better in setting boundaries." However, the children still experienced behavioral issues when they visited father. The social worker observed the children's "strong attachment" to Mr. and Mrs. E., who were "dedicated and committed to raising [them] to adulthood."

At the hearing on January 25, 2021, CFS requested the juvenile court find that the children were generally and specifically adoptable. CFS noted that, although I.R. suffers from epilepsy, autism, polydipsia, and borderline intellectual disabilities, and S.R. has some delays, Mr. and Mrs. E. "are informed and prepared to meet" their needs. Acknowledging father's consistent, appropriate visitation with the children, CFS argued that "he is more like a friendly visitor or extended family member." In response, father testified about the nature of his relationship with the children and the quality of their visitation. He opined that termination of his parental rights would break the children's

10

hearts because he "can see the love that they have for [him], and . . . they know [he has] a lot of love for them."

Following father's testimony, CFS and the children's counsel argued for termination of parental rights. Father's counsel contended the parental benefit exception applied and asked the juvenile court to adopt a lesser plan of legal guardianship. The children's counsel urged the court to follow the recommendation of CFS. The court had "no doubt" that father loved his children, but it found clear and convincing evidence of specific adoptability. Regarding the parental benefit exception, the court found that father met the first prong (regular visitation) but not the second (that the children would benefit from continuing the parental relationship). Thus, it terminated parental rights and ordered adoption as the permanent plan.

## II. DISCUSSION

Father argues the juvenile court erred in failing to apply the beneficial parental relationship exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). We disagree.

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that a child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314.) One exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) Recently, our Supreme Court examined this exception and held that a

drug-addicted parent's failure to succeed in drug rehabilitation programs and continuing struggles with addiction did not, on its own, disqualify the parent from being accorded the parental-benefit exception. (*In re Caden C.* (2021) 11 Cal.5th 614, 637-641 (*Caden C.*).) In other words, unless the factors that led to the dependency in the first place also bear on the question of whether a child would benefit from continuing the relationship and be harmed, on balance, by losing it, they are irrelevant. (*Id.* at p. 638.)

To establish the beneficial parent-child relationship exception, the parent must show (1) "regular visitation and contact with the child," (2) "the child has a substantial, positive, emotional attachment to the parent," and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see § 366.26, subd. (c)(1)(B)(i).) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)

In *Caden C.*, the Supreme Court clarified that a "hybrid" standard of review applies to the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) The first two elements are primarily factual, reviewed for substantial evidence. (*Id.* at pp. 639-640.) On the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id.* at p. 640.) Thus, any factual determinations underlying the juvenile court's

evaluation would also be reviewed for substantial evidence, but the court's ultimate balancing of the detriment of severing the parental relationship against the benefits of adoption is reviewed for abuse of discretion. (*Id*. at pp. 640-641.)

In the present case, there is no question father established the first prong of the exception, as he consistently visited the children. (§ 366.26, subd. (c)(1)(B)(i).) Thus, the issue before us is whether he met his burden on the second prong—that the children would benefit from continuing the parent-child relationship. We do not agree the evidence favoring his position bound the juvenile court to find that the exception applied or that this is one of the extraordinary cases where the exception should have been applied. Contrary to father's suggestion, "the consistency and quality of [his] visits" do not lead inevitably to a finding that the parental-benefit exception applies.

Turning to the second prong, father must show that the children would benefit from continuing a relationship with him. Traditionally, a parent is required to show that he or she occupied a """"parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) However, in *Caden C*., the Supreme Court stated: "[T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary . . . to

13

calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' [Citation.] . . . [O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632-633.)

Here, the juvenile court found that the beneficial parent-child relationship was only "incidental," as father never occupied a parental role. Considering the court's comments, we discern an implied finding that father did not meet his burden of proof on the second prong. This implied finding that the strength of the bond was insufficient to establish the parental-benefit exception is supported by the evidence. Father consistently visited the children, educated himself about their needs, and improved his behavior as directed by the social workers. However, the focus is on the children. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Father's only contact with them was during their visits. Immediately before and after these visits, the children experienced unhealthy behaviors, including night terrors, diarrhea, and tantrums. Their pediatrician associated these behaviors with anxiety, and their therapist diagnosed them with PTSD, suggesting that they "have likely witnessed abuse or domestic violence by their father, or have possibly been the victims of abuse before they were removed from the father[, and t]he memories are now likely coming to the forefront of their consciousness."

When we view the benefit of the relationship through the children's eyes, we conclude there was no substantial evidence to support a finding that father shared a

deeply bonded parental relationship with the children, such that he qualifies for the exception.  More particularly, there was no substantial evidence that the children had a "significant, positive, emotional attachment" to father.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Consequently, the juvenile court properly found the parent-child relationship exception to adoption did not apply.

### III.  DISPOSITION

The juvenile court's orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                      J.

We concur:


RAMIREZ
            P. J.


FIELDS
            J.


15